IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| KNOCKOUT HOLDINGS, LLC, f/k/a OCTO PLATFORM EQUITY HOLDINGS, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>ARVINDER KAKAR,<br><br>    Defendant. | Case No. 1:23-cv-00944<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff Knockout Holdings, LLC, f/k/a Octo Platform Equity Holdings, LLC ("Octo"), brings this Complaint against Defendant Arvinder Kakar ("Kakar") and alleges as follows:

## INTRODUCTION

1. Octo brings this case to put an end to the disturbing efforts by a former senior executive, Arvinder Kakar, to damage the company and obtain relief for the harm his conduct has caused so far – including a bizarre and spiteful campaign to defame Octo's management and interfere with its business relationships. Kakar's conduct has caused Octo substantial monetary harm so far – in excess of $150 million – which it seeks to recover, in addition to all other available relief, through this action.

2. Octo is a premier provider of enterprise solutions, program management, and technology consulting services, with a focus on providing information technology services to our federal government.

-1-

3. In December 2020, Octo purchased Sevatec, Inc. ("Sevatec"), a technology engineering and consulting company that Kakar founded and owned.

4. As part of the transaction, Kakar received a cash payment in excess of $200 million dollars and agreed to stay on in senior leadership roles as an Octo executive and board member.

5. Kakar agreed to perform his duties with fidelity and loyalty to Octo and to the best of his abilities. He also agreed to abide various post-employment obligations and not to disparage Octo or its management.

6. But as soon as the deal closed, Kakar began engaging in troubling misconduct. Among other issues, Kakar refused to perform his executive functions unless Octo adopted a new name that included "Seva" from his own company's name and leased property he owned. When Octo rebuffed his self-interested demands, he threatened a fellow board member with physical violence.

7. Octo's management and board tried repeatedly to work with Kakar to end his near-constant disruptions of its operations and self-interested conduct and convince him to engage in company affairs and carry out his roles and responsibilities for the betterment of the organization, but to no avail. Instead, Kakar resigned and filed a series of far-fetched and flawed punitive lawsuits against Octo and its management in multiple jurisdictions.

8. Not content with requiring Octo to spend substantial time and resources defending his lawsuits, Kakar has continued to defame and intentionally interfere with Octo's business in the marketplace to harass and undermine the company.

9. In November 2022, Octo began to explore a possible sale of the company. Toward that end, The International Business Machines Corporation ("IBM") and Octo entered negotiations over a possible acquisition of the company.

10. The transaction with IBM presented a unique and vital opportunity to grow Octo's business given IBM's prominence and stature in the marketplace.

11. But as soon as Kakar found out about the proposed transaction, he immediately inserted himself as a poison pill to kill it.

12. Kakar contacted IBM executives and knowingly and intentionally made false statements about Octo and its management in an effort to stop the transaction.

13. Among other defamatory statements, Kakar told IBM that Octo and its management were "crooks and liars," that they cheated him out of compensation and lied to him about meeting promises and obligations, and unlawfully acquired his ownership interest in Octo.

14. Kakar knew that his statements to IBM were false and acted intentionally and with malice to prevent Octo from consummating the transaction.

15. Each of Kakar's defamatory statements were then published throughout IBM, eventually reaching IBM's board.

16. On information and belief, Kakar's statements were also published to third parties operating in the same marketplace as Octo.

17. In light of Kakar's defamatory statements and interference, IBM expressed concerns to Octo about entering the deal because the "shine was off" the company.

18. Although the transaction ultimately closed, Kakar's defamatory statements and interference significantly and materially adversely impacted Octo's negotiation position and enterprise value.

19. Octo was left to accept less favorable terms on critical issues, including accepting a purchase price that was *$150 million* less than the company's enterprise value. And because Kakar's statements were published within the marketplace, Octo could not abandon its transaction with IBM to pursue other opportunities, none of which would have been as favorable.

20. In addition, Kakar has also harmed Octo's reputation and goodwill in the marketplace, which has hindered Octo's ability to win projects and bids.

21. Octo has had to devote significant time and resources to address Kakar's defamatory statements and misconduct, thereby disrupting Octo's operations and distracting management from running the company.

22. Octo now brings this suit to obtain damages from Kakar, including punitive damages, and declaratory relief for the harms he has caused the company.

## PARTIES

23. Plaintiff Octo is a premier provider of enterprise solutions, program management, and technology consulting services, with a focus on providing information technology services to our federal government.

24. Defendant Arvinder Kakar is a former Octo executive, board member, and owner. Kakar is domiciled in Potomac, Maryland.

## JURISDICTION AND VENUE

25. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties.

26. Octo is a limited liability company, and as such, has the citizenship of its members. *See Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011).

27.     Octo is a citizen of Virginia, California, Arizona, Florida, Vermont, Connecticut, Colorado, Texas, South Carolina, Massachusetts, New Jersey, New York, Illinois, the District of Columbia, and the British Virgin Islands because its members are citizens there.

28.     Kakar is domiciled in Maryland and thus a citizen of Maryland for jurisdictional purposes.  *See Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 145 F.3d 660, 663 (4th Cir. 1998).

29.     The parties are therefore completely diverse for purposes of diversity jurisdiction. *See* 28 U.S.C. § 1332.

30.     The amount in controversy also far exceeds the sum or value of $75,000.  *See id.* § 1332(a).

31.     Kakar's unlawful conduct, including his defamatory statements and intentional interference with Octo's business relationships, has caused Octo to suffer over $150 million in damages.

32.     The Court has personal jurisdiction over Octo because it transacts business in the Commonwealth.  *See* Va. Code Ann. § 8.01-328.1(A)(1).

33.     The Court has personal jurisdiction over Kakar.  Kakar substantially injured Octo through his actions and omissions in Virginia and transacted business in Virginia as an Octo executive.  *See id.* § 8.01-328.1(A)(1) & (3).

34.     Kakar further published his defamatory statements regarding Octo to citizens of the Commonwealth.  *See id.*

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Octo's claims against Kakar occurred in this District.

## FACTUAL ALLEGATIONS

### *Octo Acquires Sevatec*

36. In 2020, Octo and Kakar entered negotiations for the acquisition of Sevatec, Inc. ("Sevatec"), a technology company Kakar owned and founded.[1]

37. Octo and Kakar entered several agreements for Octo to acquire Sevatec. In exchange, Kakar received $205 million in compensation.

38. As part of the transaction, Kakar also agreed to act as Octo's Vice Chair and Head of Strategy under an employment agreement. *See* Employment Agreement, Exhibit ("Ex.") 1.[2]

39. In his role as an Octo executive, Kakar agreed to lead the post-acquisition integration of the combined company, manage legacy Sevatec accounts, and engage in strategic planning for Octo, among other tasks. *Id.* § 3; Notice of Material Breaches and Willful Misconduct ("Notice"), Ex. 2.

40. He also agreed to perform his duties with fidelity and loyalty to Octo and to the best of his abilities. Ex. 1 § 3.

41. Kakar further agreed not to disparage Octo's management and to abide restrictive covenants related to non-competition, non-solicitation, and non-disclosure of confidential information. *Id.* § 9.

42. Kakar also entered a non-compete agreement that imposed additional post-employment obligations. *See* Non-Compete Agreement, Ex. 3.

---

[1] At the time of the Sevatec transaction, Octo was the parent company of Octo Consulting Group, LLC ("Octo Consulting"), the operational entity of the business. However, following a corporate restructuring, the operations have been consolidated into Octo. While Octo and Octo Consulting are not necessarily parties to the same transaction agreements related to the Sevatec transaction, they are referred collectively as Octo in this Complaint for simplicity.

[2] The transaction agreements contain proprietary information and are subject to confidentiality provisions. Octo will file the agreements upon the entry of an appropriate protective order.

43. Under the non-compete agreement, Kakar agreed to refrain from soliciting Octo's employees and customers, disclosing Octo's internal and business information, and competing against Octo. *Id.* §§ 3.1-3.4.

44. In addition to his role as an Octo executive, Kakar became a board member of Octo. *See* Board Agreement, Ex. 4.

45. As a board member, Kakar agreed to manage the "business and affairs" of Octo and act in "good faith." Operating Agreement §§ 7.1 & 7.3, Ex. 5; Board Agreement, Ex. 4.

### *Kakar Violates His Contractual And Fiduciary Obligations And Sues Octo And Its Management*

46. The acquisition of Sevatec closed in December 2020.

47. Within weeks of the transaction closing, however, Kakar abandoned his executive duties after disagreements arose involving management's internal decisions and Kakar engaged in self-interested conduct to the detriment of the company. Notice, Ex. 2.

48. Kakar's misconduct was extensive and disturbing. Among other issues, Kakar:

- Disagreed with management's decision not to include "Seva" in the new company's name and demanded a name change, even though Octo, supported by outside marketing experts, determined his preferred name would water down the stronger Octo brand and cause customer confusion, thereby hurting the company's business and decreasing shareholder value, Ex. 2 at 2–4;

- Demanded Octo pay him to lease commercial space he owned, even though the company had no use for it and the lease payments would waste corporate assets, *id.*;

- Mismanaged and abdicated oversight over legacy Sevatec projects, resulting in Octo spending millions of dollars in additional project costs to repair client relations and meet outstanding deliverables, *id.*;

- Criticized management in front of legacy Sevatec personnel, alleging they were "dishonest" and lacked any business acumen, *id.*;

- Physically and verbally threatened Octo board members, *id.*; and

- Berated employees, forcing them to resign out of discomfort and intimidation, *id.*

49. Kakar's breaches and misconduct seriously harmed Octo. Instead of focusing on Octo's core business, management was forced to spend substantial time and resources addressing Kakar's bizarre and harmful misconduct and divisive actions.

50. Octo also spent millions of dollars in extra costs to salvage projects and client relations Kakar mismanaged, and paid him compensation for work he did not perform.

51. In response to Kakar's conduct and the harms it caused Octo, Octo's board was forced to open an investigation, which ultimately led it to issue a Notice to Kakar identifying his specific breaches and misconduct. Notice, Ex. 2.

52. The board also provided Kakar an opportunity to address the matters presented in the Notice and cure his misconduct. *Id*. at 4.

53. But Kakar refused, instead submitting a written response denying any wrongdoing and attacking the board and management.

54. Kakar then abruptly resigned as an executive in November 2021 and later as a board member on January 13, 2022. Ex. 6.

55. On January 14, 2022, one day after he completely resigned from Octo, Kakar filed four lawsuits against the company and its board in Delaware and Virginia state courts.[3]

### *Kakar Defames Octo And Intentionally Interferes With Its Business Relations*

56. In November 2022, Octo entered negotiations with IBM for the possible acquisition of the company.

---

[3] *See Arvinder ("Sonny") Kakar, et al. v. Octo Consulting Group, LLC*, Del. Super. Ct., C.A. No. N22C-01-104 PRW; *Arvinder "Sonny" Kakar v. Mehul Sanghani, et al.,* Fairfax Co. Cir. Ct. (Va.), Case No. CL-2022-0000607; *Seva Holdings Inc., v. Octo Platform Equity Holdings, LLC, et al.*, Del. Ch., C.A. No. 2022-0437-KSJ; *SGS Properties, LLC, v. Sevatec, LLC, F/K/A Sevatec, Inc.*, Fairfax Cir. Ct. (Va.), Case No. CL-2022-755. All of these cases remain pending and active.

57. Given the scale and stature of IBM in the marketplace, the proposed acquisition presented a strategically vital growth opportunity for Octo.

58. Shortly before the deal became public, Kakar learned of the transaction.

59. In response, Kakar immediately moved to inject himself as a poison pill and kill the transaction out of spite but also to gain leverage in his litigations and harass Octo and its management.

60. Indeed, as soon as he learned of the transaction and ongoing negotiations, Kakar made his intentions clear to Octo's Chief Executive Officer, Mehul Sanghani.

61. Kakar texted Mr. Sanghani that he "heard from a little birdie" about the deal, and warned Mr. Sanghani not to "celebrate just yet."  Ex. 7.

62. He further warned that Mr. Sanghani should be "ready to put your big boy pants on if you have any." *Id.*

63. He also set about texting other Octo personnel that it was "never the wrong time to do the right thing" – the "thing" being helping him thwart the IBM transaction and harm Octo. *Id.*

64. Kakar's plan was simple and diabolical: Contact IBM's senior personnel and board members – and anyone else who would listen to his rants – and publish false statements and lies about Octo and its management to derail the transaction and harm the company.

65. Kakar reached out to Cece Decamp, an industry lead at IBM who specialized in government projects and relations.  *See* Ex. 8.

66. Kakar called Ms. Decamp and made numerous false and disparaging statements about Octo with the intention of preventing the deal from closing and harming the company.

67. During the call, Kakar seemed mentally distraught and yelled that Octo and its management were "liars and crooks" who cheated him and warned that Octo was lying to IBM too.

68. He further told Ms. Decamp that Octo cheated him out of substantial compensation and that it did not honor any of the promises it made to him or legacy Sevatec personnel when acquiring Sevatec.

69. And Kakar told her that Octo pushed him aside after he joined the company as an executive and board member and later fired him.

70. Kakar also claimed there were "secrets" about Octo related to how Octo operates, of which IBM was unaware and needed to know before moving forward with the deal.

71. Kakar told Ms. Decamp that, because Octo had improperly acquired his shares in the company, there was no way IBM should proceed with the transaction.

72. Kakar demanded that Ms. Decamp provide contact information for someone at IBM who he could speak to further about his claims and allegations.

73. Kakar also asked Ms. Decamp to escalate the issue to more senior management at IBM to make sure they were aware of his claims and allegations.

74. Ms. Decamp then told Susan Wedge, a senior IBM executive, about her conversation with Kakar.

75. She informed Ms. Wedge about the statements Kakar published to her.

76. Among other statements, Ms. Decamp told Ms. Wedge that Kakar said Octo and its management were "liars and crooks" and improperly bought his shares.

77. She further told Ms. Wedge that Kakar claimed Octo had "secrets" and issues and would not honor any of its commitments to IBM, and that the company should not close on the transaction.

78. Ms. Decamp later notified Kakar that she contacted her superior at IBM.

79. Kakar immediately called Ms. Decamp, and again stated that Octo and its management were "liars and cheats" and IBM needed to know about its secrets.

80. When asked by Ms. Decamp why his counsel, Charles Sims of O'Hagan Meyer, did not contact IBM on his behalf, Kakar said he personally was in the best position to explain the situation to IBM.

81. Kakar also contacted other IBM personnel and repeated many of the same false and defamatory statements. *See* Ex. 8.

82. For example, Kakar contacted Andrew Fairbanks, another IBM industry manager.

83. Kakar told Mr. Fairbanks that he was in active litigation with Octo and that Octo wronged him out of compensation.

84. After reports of Kakar's statements circulated among IBM managers and executives, IBM expressed serious concerns to Octo about proceeding with the proposed transaction.

85. On information and belief, Kakar's statements were relayed to the IBM board.

86. Among those statements relayed to IBM's board were Kakar's statements that Octo was full of "liars and crooks" who cheated him.

87. IBM's board also learned of Kakar's statements that Octo allegedly failed to meet its obligations to Kakar and improperly acquired his shares.

88. And IBM's board learned that Kakar said IBM should not proceed with the transaction because of supposed "secrets" existing at Octo.

89. IBM explained to Octo that, based on Kakar's statements, the "shine was off" of the company as a prized acquisition target.

90. As such, Octo lost all of its leverage and negotiation position to enter the transaction on the most favorable terms for the company.

91. Instead, Octo had to accept less favorable terms on key contract issues related to, among other things, the purchase price for the company.

92. Although the transaction ultimately closed, Octo received substantially less compensation than it should have and accepted less favorable terms because Kakar's conduct poisoned negotiations.

93. Octo also could not seek alternative deals and proposals from other potential buyers.

94. On information and belief, Kakar published his defamatory statements to third parties in the same marketplace as Octo.

95. With knowledge of Kakar's statements, other third-party buyers would not offer more favorable terms to Octo – in fact, they would have been less favorable than those offered by IBM.

96. With its negotiation position eroded, Octo was left with little choice but to proceed with the IBM transaction on less favorable terms and over $150 million less in compensation.

### Kakar's Unlawful Conduct Has
### Caused Octo To Suffer Substantial Harm

97. With his statements published to IBM and its board, Kakar defamed Octo and intentionally interfered with Octo's business relationships, causing it to suffer substantial and serious harm.

98. All of the statements that Kakar made to IBM's executives were defamatory and published throughout IBM.

99. Kakar orally published his statements to Ms. Decamp.

100. Ms. Decamp then reported all of Kakar's statements, which were republished to IBM's executive management and, ultimately, the board of IBM.

101. Kakar further knew his statements were false based on facts that Kakar knew at the time he made them, including:

- Octo and its management were not "liars and crooks" who cheated Kakar or legacy Sevatec personnel out of any compensation. In fact, he received substantial compensation – $205 million – for the sale of his company pursuant to the parties' agreements. Ex. 9. Rather, Kakar "cheated" Octo out of value by continuing to receive a salary and benefits despite refusing to engage or perform any of his executive functions. Exs. 10-11.

- Octo did not push Kakar out of the company or fire him. Kakar resigned on his own accord. Ex. 6. He further refused to appear before the board to discuss his performance issues despite being invited to do so. Ex. 2.

- Octo did not unlawfully acquire Kakar's shares in the company. Octo had a legal right under the parties' agreements, which Octo invoked in light of Kakar's misconduct and breaches. Ex. 4. And Kakar further received contracted for compensation under the agreement for his shares. Ex. 12.

- Octo did not have any "secrets" related to its operations or supposed improper business practices. As a former officer and board member of the company, Kakar knew Octo operated transparently and ethically, and in compliance with regulatory and other requirements.

102. Even though Kakar knew his statements were false, Kakar intentionally published them to IBM to harm Octo and its management.

103. Kakar intentionally and willfully sought to harm Octo's business relationships with IBM and derail the transaction, thus depriving Octo of future growth opportunities.

104. Kakar further made his defamatory statements intentionally to cast aspersions on Octo's honesty, prestige, and standing in the marketplace.

105. Additionally, Kakar willfully and intentionally interfered with Octo's relationship with IBM to harm Octo and undermine its future growth and business prospects.

106. By making his defamatory and false statements to IBM, he adversely impacted Octo's ability to negotiate more favorable transaction terms.

107. Among other issues, Octo accepted a purchase price that was over $150 million less than its enterprise value before Kakar made his defamatory statements.

108. On information and belief, Kakar also published his defamatory statements to third parties in the marketplace in which Octo operates.

109. As such, Octo could not have obtained or negotiated more favorable terms, including a higher purchase price, in the marketplace because Kakar's statements took the "shine" off of the company.

110. And because Kakar's statements have been published and spread throughout the marketplace, Octo has suffered substantial harm to its goodwill and reputation as well.

111. This has impacted Octo's ability to win government projects and bids in the marketplace.

112. Kakar's misconduct has also caused Octo substantial financial harm by distracting Octo's management and personnel, thereby creating a management tax on the company.

113. Instead of devoting resources and efforts to Octo's growth and day to day affairs, management has had to devote precious time and resources to address Kakar's defamatory statements and interference and the resulting harms to Octo's reputation in the marketplace.

## CAUSES OF ACTION

### COUNT I
**(Defamation *Per Se*)**

114. Octo realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115. Kakar orally published defamatory statements to IBM.

116. Kakar told Ms. Decamp, an industry lead at IBM, that:

- Octo and its management were liars and crooks;

- Octo and its management "cheated" Kakar out of earnout and other compensation;

- Octo and its management did not honor any of the promises made to Kakar and legacy Sevatec personnel when acquiring Sevatec;

- Octo would not meet its obligations or honor its promises to IBM;

- Octo improperly acquired his shares in the company, and IBM could not proceed with the transaction as a result; and

- Octo had harmful "secrets" that IBM did not know about and that IBM needed to know.

117. Ms. Decamp repeated and published these false statements to Susan Wedge, a senior IBM executive, and these statements were in turn published to IBM's board.

118. Each of these statements were published to the IBM board.

119. Each of the statements Kakar published are actionable statements.

120. Each of the statements Kakar published were false.

121. Kakar further knew that his defamatory statements were false and/ or that he lacked any reasonable basis to believe that his defamatory statements were true.

122. Each of Kakar's statements further cast a negative light on Octo's reputation and have deterred or would deter third persons from associating with Octo.

123. Each of Kakar's defamatory statements are also defamatory *per se* because they cast aspersions on Octo's honesty, prestige, and standing in its field of business.

124. Kakar published these statements in bad faith, with ill will and personal spite, and knowing they were false solely to harm Octo and undermine its business operations, value, and growth prospects.

125. Kakar further acted with actual malice and a reckless and conscious disregard for Octo's rights by willfully and intentionally acting to thwart Octo's transaction for no reason other than to harm the company and decrease its value.

126. As a direct and proximate result of Kakar's defamatory statements, Octo has suffered and continues to suffer serious harm.

127. In negotiating and closing on its transaction with IBM, Octo lost its favorable negotiation position and leverage on critical contract terms, including the purchase price, because Kakar poisoned Octo's negotiations with IBM and other third parties.

128. Octo further has had its reputation and goodwill harmed in the marketplace based on Kakar's defamatory statements, which has negatively impacted Octo's ability to win projects and bids.

129. Additionally, Octo has had to devote significant time and resources to address Kakar's defamatory statements and misconduct, thereby disrupting Octo's operations and distracting management from running the company.

130. Octo is entitled to damages, including punitive damages, and declaratory relief, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT II
### (Tortious Interference With Business Expectancy)

131. Octo realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 113 of this Complaint as if fully set forth herein.

132. In 2022, Octo had an established business relationship with IBM and was in the process of negotiating and closing on IBM's potential acquisition of Octo.

133. Octo had a business expectancy arising out of its relationship with IBM that it would be acquired at a price fairly representing its enterprise value.

134. Kakar knew of Octo's relationship with IBM and the ongoing negotiations for IBM to acquire Octo.

135. Out of ill will, personal spite, and a specific desire to harm Octo and devalue the company, Kakar employed improper methods to harm Octo's relationship with IBM.

136. Kakar intentionally made numerous false and defamatory statements about Octo to senior IBM management despite knowing those statements were false.

137. Kakar pressured IBM executives to escalate his false statements and demands to additional IBM executives and the board to abandon the transaction.

138. Kakar acted intentionally and willfully to harm Octo by undermining Octo's relationship with IBM and thwarting the transaction to deprive Octo of substantial compensation and growth opportunities.

139. Kakar further acted with actual malice and a reckless and conscious disregard for Octo's rights by willfully and intentionally acting to thwart Octo's transaction out of spite and to harm the company and decrease its value.

140. Absent Kakar's malicious, intentional, and willful interference with Octo's business relationship with IBM, Octo would have obtained more favorable contract terms, including a substantially higher purchase price reflective of its enterprise value.

141. As a direct and proximate result of Kakar's conduct, Octo has suffered and continues to suffer serious harm.

142. In negotiating and closing on its transaction with IBM, Octo lost its favorable negotiation position and leverage on critical contract terms, including the purchase price, because Kakar poisoned Octo's negotiations with IBM and other third parties.

143. Octo further has had its reputation and goodwill harmed in the marketplace based on Kakar's misconduct and interference, which have undermined Octo's ability to win projects and bids.

144. Additionally, Octo has had to devote significant time and resources to address Kakar's misconduct, thereby disrupting Octo's operations and distracting management from running the company.

145. Octo is entitled to damages, including punitive damages, and declaratory relief, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT III
**(Declaratory Judgment Pursuant To 28 U.S.C. § 2201)**

146. Octo realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 113 of this Complaint as if fully set forth herein.

147. An actual and justiciable controversy exists concerning whether Kakar's conduct constitutes defamation *per se* and tortious interference with Octo's business expectancy and relationships.

148. Octo alleges Kakar has defamed Octo and tortiously interfered with its business expectancy, while Kakar disputes Octo's allegations.

149. Pursuant to 28 U.S.C. § 2201, a judicial determination of the respective rights of the parties is necessary and appropriate

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Knockout Holdings, LLC, f/k/a Octo Platform Equity Holdings, LLC, prays for this Court to enter judgment against Arvinder Kakar, granting the following relief:

1. Declarations that:

   - Kakar defamed Octo by knowingly publishing false statements to IBM;
   - Kakar's defamatory statements constitute defamation *per se*;
   - Kakar tortiously interfered with Octo's business relationship with IBM; and
   - Kakar acted with actual malice and/ or reckless disregard of Octo's rights.

2. Actual damages in an amount to be proven at trial;

3. Punitive damages, as permitted by law;

4. Costs of suit herein, as permitted by law;

5. Attorney's fees, as permitted by law;

6. Pre-judgment, post-judgment, and other interest on all monetary damages, as permitted by law; and

7. Any and all such further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Octo demands a trial by jury in this action on all issues so triable as of right.

Dated: July 18, 2023

_[signature]_

Paul Werner  (VSB No. 48910)
Imad Matini (VSB No. 90126)
Sheppard, Mullin, Richter & Hampton LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: 202-747-1931
Facsimile: 202-747-3817
pwerner@sheppardmullin.com
imatini@sheppardmullin.com

*Attorneys for Plaintiff Knockout Holdings, LLC, f/k/a Octo Platform Equity Holdings, LLC*